UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    Plaintiff,

v.                Case No. 21-CR-25

STEVEN R. BRANDENBURG,

    Defendant.

---

UNITED STATES' MEMORANDUM OF LAW IN SUPPRORT OF ITS ANTICIPATED REQUEST THAT DEFENDANT BE REMANDED

---

The United States of America, by and through its undersigned attorneys, hereby respectfully submits this memorandum of law, in support of its anticipated request that Defendant Steven R. Brandenburg be remanded into custody after changing his plea in the above-captioned matter.

Defendant Brandenburg attempted to destroy over 500 doses of the Moderna COVID-19 vaccine. What's worse, he concealed his misconduct, and fifty-seven people received doses of vaccine that Brandenburg had attempted to alter. For weeks, these victims did not know if they had been inoculated, poisoned, or given the functional equivalent of a placebo.

Defendant has signed a plea agreement, [2], and he is scheduled to plead guilty to two counts of attempted tampering with a consumer product on February 9, 2021, [3].

After Defendant is adjudicated guilty, the Government intends to request that he be remanded into custody. At that time, it will be Defendant's burden to establish, by clear and convincing evidence, that he does not pose a risk to public safety.

He cannot clear this threshold, given the chilling evidence recounted here. The Court should accordingly order that Defendant be remanded into custody pending sentencing.

## I. Factual Background

### A. The COVID-19 Pandemic and the Moderna Vaccine

In early 2020, public health authorities began to identify, treat and study coronavirus disease 2019 ("COVID-19"), an infectious disease caused by a novel coronavirus, now known as "severe acute respiratory syndrome coronavirus 2" or "SARS-CoV-2." In March 2020, the World Health Organization declared the COVID-19 outbreak a pandemic, and the United States of America declared a public health emergency.

Research concerning COVID-19 is ongoing, but it is predominantly a respiratory illness that can affect other organs. The severity of COVID-19 symptoms ranges from mild to very severe. Symptoms of COVID-19 may appear 2 to 14 days after exposure to the virus and may include fever or chills; cough; shortness of breath; fatigue; muscle and body aches; headache; loss of taste or smell; sore throat; congestion or runny nose; nausea or vomiting; and diarrhea. Some people can experience severe symptoms, including confusion, trouble breathing, pneumonia, and death.

As of February 8, 2021, the Centers for Disease Control and Prevention ("CDC") indicate that over 26 million cases of COVID-19 have been reported in the United States, with over 460,000 associated deaths.

Several governments and pharmaceutical companies—including but not limited to Moderna, Inc. ("Moderna")—have understandably attempted to develop drugs to prevent and treat COVID-19. Moderna specifically developed a biological product that is injected into a recipient's muscle for active immunization to prevent COVID-19 in individuals 18 years of age and older (the "Moderna COVID-19 Vaccine"). The Moderna COVID-19 Vaccine was initially authorized for administration to the public by the Food and Drug Administration ("FDA"), pursuant to an Emergency Use Authorization, on December 18, 2020.

The Moderna COVID-19 Vaccine has strict specifications regarding its storage and subsequent administration, as detailed in the "Fact Sheet For Healthcare Providers Administering Vaccine" (available at https://www.fda.gov/media/144637/download). This same Fact Sheet, which is available to both providers of the vaccine and their employees, provides, in relevant part, as follows:

> *As Displayed on the Vial Labels and Cartons*: The Moderna COVID-19 Vaccine multiple-dose vials are stored frozen between -25º to -15ºC (-13º to 5ºF). Store in the original carton to protect from light.
>
> *Additional Storage Information Not Displayed on the Vial Labels and Cartons:* Do not store on dry ice or below -40ºC (-40ºF). Vials can be stored refrigerated between 2° to 8°C (36° to 46°F) for up to 30 days prior to first use. Unpunctured vials may be stored between 8° to 25°C (46° to 77°F) for up to 12 hours. Do not refreeze once thawed.

B.  **Defendant's Background and Knowledge**

Defendant Brandenburg is a licensed pharmacist, with decades of experience. Since 2012, he has been the "third shift" pharmacist at the Advocate-Aurora Medical Center located at 975 Port Washington Road in Grafton, Wisconsin (the "Grafton Facility"). In that capacity, Brandenburg would typically work at the Grafton Facility from approximately 11:00 PM until 7:00 AM. He was frequently the only pharmacist on duty, for hours at a time.

As a pharmacist, Defendant knew and understood that: (1) public health authorities, including but not limited to the CDC, believe COVID-19 currently poses a serious global health threat; and (2) the Moderna COVID-19 Vaccine is intended to help mitigate that same threat.

He similarly knew and understood that when vaccines like the Moderna COVID-19 Vaccine are not stored in a manner consistent with the specifications articulated by public health authorities, their administration to patients poses a risk of bodily harm and death, insofar as the vaccines at issue may: (1) be rendered less potent or even inert; (2) break down into component parts which are themselves dangerous; or (3) become contaminated with foreign pollutants or pathogens.

Brandenburg was also familiar with the aforementioned "Fact Sheet For Healthcare Providers Administering Vaccine," and he understood that the Moderna COVID-19 Vaccine was not to be left out of refrigeration for more than twelve hours prior to its administration to patients.

4

### C. Defendant's Concerning Past Behavior

Despite his education, professional training, and experience as a medical professional, Defendant is a conspiracy theorist and vaccine skeptic. He believed that the authorities were "out to get him"; that Judgment Day was imminent; that the 9/11 terrorist attacks were "fake"; that the Earth was flat; that he was a "prophet"; and that vaccines were "of the Devil." Defendant had particular issues with the Moderna COVID-19 Vaccine, believing that it was "microchipped" and would render recipients infertile.

Over the past few years, Defendant frequently shared his extreme views with others. And he acted on these beliefs, in increasingly disturbing ways.

On multiple occasions, Defendant was able to convince various co-workers to replace their annual flu vaccine with an inert saline solution. In these instances, Defendant would utilize the pharmacy's technology to generate a label reflecting that a given syringe contained the annual flu vaccine; provide that label and a syringe containing saline to his accomplice; and then his accomplice would present the label and saline-syringe to an Aurora employee charged with administering the vaccine. In this way, Brandenburg's accomplices would receive saline in lieu of the annual flu vaccine that was required as a condition of their employment with Aurora. Brandenburg himself also avoided receiving the annual flu vaccine using a similar plan. Each of these instances reflects a violation of federal law. *See generally* 21 U.S.C. §§ 331, 352. And each placed hospital patients at increased risk of contracting influenza (which itself can be fatal).

Even more disturbing was Defendant's habit of bringing firearms to the Grafton Facility, in direct violation of the facility's rules and regulations. One witness described how Defendant, in approximately November 2020, showed that same witness a handgun and explained that it was for use in case the "military came to take him."

Defendant's ex-wife ("GB") described similarly alarming behavior in the course of their divorce proceedings. More specifically, in a filing dated December 30, 2020, GB recounted how the Defendant had rental units in which "bulk food and guns" were being stored. GB also wrote that she was so "concerned about [her] safety and the safety of [their] children," as a result of Defendant conduct and rhetoric, "that [she] left town for a period of time." Defendant allegedly told her that "the government" was "planning cyber attacks" and intended "to shut down the power grid," which caused Defendant to leave her "a water purifier, a large bucket of powdered milk and two 30-day emergency food buckets." GB also relayed that after their youngest child had spent the weekend with the Defendant, that same child told GB, "This is not our home, Heaven is our home." GB stated to the divorce court that, based "on these statements, [she was] concerned that the children [were] in [risk of] imminent harm," as Defendant might attempt to "take the children to heaven."

### D. Defendant's Dangerous Crimes

Defendant's alarming rhetoric and actions culminated in his committing a series of crimes in late December 2020.

On two successive shifts, beginning December 24 and December 25, 2020, Defendant removed the same set of Moderna COVID-19 Vaccine from the refrigerator in

the pharmacy at the Grafton Facility. This set contained over 500 doses of vaccine, and Defendant left it out for multiple hours each night, intending to render it inert.

Defendant's crime was only discovered after a pharmacy technician working on the early morning hours of December 26 alerted her supervisors to the vaccine's presence outside the refrigerator. When confronted, Defendant repeatedly lied and said the vaccine must have been left out on accident. Defendant also did not initially acknowledge that the vaccine had been removed from the refrigerator on a prior occasion.

As part of his arrest in the corresponding state case, multiple firearms were recovered from the Defendant.

### E. The Various Harms Defendant Caused

As Defendant well knew, the 500 vaccine doses that he attempted to tamper with were scheduled for imminent administration. And fifty-seven of those same doses were in fact given to patients on the morning of December 26, 2020.

The Government is still investigating the extent to which the vaccine at issue was affected by Defendant's misconduct. But even if the vaccine received by these fifty-seven people remained effective despite Defendant's best efforts—which is currently the Government's best guess, based on testing completed to date—the harms here were multifaceted and severe.

Most obviously, the fifty-seven people who received the vaccine have been forced to live with the uncertainty and anxiety associated with not knowing what has been put into their bodies. *See*, *e.g.*, Exhibit 1, Anonymized Victim Impact Statement (one of the

7

Case 2:21-cr-00025-BHL   Filed 02/08/21   Page 7 of 14   Document 9

fifty-seven—a medical professional—describing feelings of "anxiety," "anger," "lasting worry and stress," alongside an inability to focus on daily tasks or sleep).

Aurora and its other employees have suffered reputational harm, experienced genuine fears for their safety, and been forced to implement additional security precautions, as a direct result of Defendant's actions. *See* Exhibit 2, Advocate-Aurora's Victim Impact Statement.

Defendant's crimes have also engendered an ongoing, macro-level threat to public health. By engaging in the crimes of conviction, despite his training and experience, Defendant lent the imprimatur of his title to various conspiracy theories and anti-vaccine views. His actions have been lauded on the internet by those who share his dangerous perspective. *See generally*, Exhibit 3, Sample Social Media Postings Supporting Defendant's Conduct ("His conscience is clear" because "he did his job"; "Ahhh I wouldn't take that crap if they offered me all the gold on Earth," since "they own people know its poison"; "I def won't take these if they can be spoiled"; "I commend him . . . The lab coats and general public know").

Public health authorities have been working diligently, for months, to educate the public about the benefits of vaccination against COVID-19, and Defendant's crimes directly undermined those efforts. The human cost associated with those harms is difficult to quantify but very real.

The Court should ensure no further damage is done by detaining the Defendant pending sentencing.

## II. Argument

The Seventh Circuit has previously explained that these offenses of conviction are "unquestionably dangerous[.]" *United States v. Smith*, 544 F.3d 781, 785 (7th Cir. 2008).

Given that same danger, Defendant should be detained pending sentencing.

### A. Defendant's Burden: "Clear and Convincing" Evidence

The controlling statute mandates detention pending sentencing, irrespective of the offense of conviction, unless the Court "finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community." 18 U.S.C. § 3143(a)(1). Defendant bears the burden of overcoming this presumption of detention. *See* Fed. R. Crim. P. 46(c).

The familiar factors articulated in Section 3142(g) guide the Court's assessment of whether Defendant has cleared this threshold. *See United States v. Ashley*, No. RDB-06-0034, 2020 WL 1675994, at *3 (D. Md. Apr. 6, 2020) (applying the Section 3142(g) factors to evaluate a defendant's danger to the community under Section 3143(a)(1)); *see also United States v. Hawkins*, No. CR 2:10-00458 WBS, 2013 WL 1500376, at *1 (E.D. Cal. Apr. 10, 2013) (same).

Those factors, as the Court knows, include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

### B. Each of the Doctrinal Factors Favors Detention

Each applicable factor weighs in favor of detention in this case, as explained below.

9

1. **Nature and Circumstances of the Offense**

The nature and circumstances of this offense are aggravated. In the midst of a raging pandemic, this Defendant wasted over 500 doses of life-saving vaccine. He undermined public faith in both the vaccines and our health care institutions. And he covered up his crime, until fifty-seven people had already paid the price for his choices.

Had Defendant's plan succeeded, more than 500 individuals would have wrongly assumed they had some protection against the deadly coronavirus. And the attendant harm would have extended far beyond those 500. These vaccines were intended for workers in a health care facility, who would themselves encounter countless others daily. It is difficult to overstate the human suffering Defendant's crimes could have caused, but for the saving combination of simple luck and diligent investigation.

2. **Weight of the Evidence**

This factor obviously favors detention.

3. **History and Characteristics of the Defendant**

Defendant has a serious history of mental health issues, as documented in the pretrial services report. Unfortunately, the pretrial services report also reflects that defendant disclaims any need for mental health counseling and relies on his religious beliefs to manage his mental health issues. This is an alarming representation, given the escalating pattern of misbehavior described above and Defendant's history.

On balance, this factor similarly favors detention, even though Defendant has no criminal history to speak of.

### 4. Nature and Seriousness of the Danger to Individuals and the Community

Defendant poses a danger to the public in terms of physical violence, given his connection to firearms and erratic behavior. Indeed, the people who knew him best—his employer and his former spouse—have taken discrete steps to protect themselves from the Defendant. Their actions speak volumes.

As this Court knows, the dangerousness inquiry is not "not limited solely to the danger of physical violence, but includes" economic danger and harms to the public writ large. *See United States v. Souresrafil*, No. 18CR911JNETNL, 2018 WL 3492155, at *1 (D. Minn. July 20, 2018); *see also* Report of the Senate Committee on the Judiciary, S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3195 ("The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.").

This Defendant has demonstrated an ability to cause these sorts of macro-level harms, by undermining faith in both vaccines and public health authorities. He also had no compunctions about violating rules intended to protect the public health. If Defendant is released, there is a substantial chance he will continue to endanger the public health in this fashion, given the strength of his convictions.

The Court should not countenance this risk, particularly given the applicable burdens. The Defendant should be detained.

### C. Other Factors Similarly Favor Detention

Various other factors, external to Sections 3142 and 3143 but nevertheless frequently weighed by courts faced with detention decisions, similarly cut in favor of detention here.

#### 1. Defendant's Presentencing Detention Is Unlikely To Run Longer Than His Eventual Sentence

This is not a case where presentencing detention is likely to exceed the eventual term of imprisonment.

The applicable base offense level is 25. *See* United States Sentencing Guidelines, § 2N1.1(a). With no additional enhancements, a three-point reduction for timely acceptance of responsibility, and a Criminal History Category of I, a defendant can reasonably anticipate a Guideline sentencing range of 41-51 months' imprisonment.

Defendant will, in all probability, be sentenced within the next three-to-six months.

This factor is therefore not an obstacle to detention.

#### 2. The Current Pandemic

At least one federal court has indicated that the current pandemic does not inform the detention analysis, as a doctrinal matter. *See United States v. Lee*, No. 19-CR-298, 2020 WL 1541049, at *1 (D.D.C. Mar. 30, 2020) ("the COVID-19 pandemic does not materially bear on any of the detention factors set forth in 18 U.S.C § 3142(g)"). And this defendant

12

is a physically healthy man with no known comorbidities, according to the pretrial services report. This consideration should not impact the Court's detention analysis.

### III. Conclusion

The people with the most direct exposure to the Defendant sufficiently feared for their safety that they took tangible steps to protect themselves. At least one judge imposed a no-contact order between the Defendant and his children, given these same concerns. To reiterate: those actions speak volumes.

The Defendant has mental health problems, with a demonstrated willingness and ability to (i) flout the rules; (ii) conscript others into his schemes; and, (iii) inspire dangerous public sentiment. Given that history, and the applicable burden here, he should be detained pending sentencing.

Dated at Milwaukee, Wisconsin, this 8th day of February, 2021.

Respectfully submitted,

MATTHEW D. KRUEGER
United States Attorney

By:  *s/ Kevin Knight*
Kevin C. Knight
Assistant United States Attorney
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1727
kevin.knight@usdoj.gov

Ross S. Goldstein
Senior Litigation Counsel
United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, D.C. 20044
Telephone: (202) 353-4218
ross.goldstein@usdoj.gov

Rachel E. Baron
Trial Attorney
United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, D.C. 20044
Telephone: (202) 598-7719
rachel.e.baron@usdoj.gov