UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    Plaintiff,

v.                      Case No. 21-CR-25

STEVEN R. BRANDENBURG,

    Defendant.

---

UNITED STATES' SENTENCING MEMORANDUM

---

  The United States of America, by and through its undersigned attorneys, hereby respectfully submits this sentencing memorandum regarding Defendant Steven R. Brandenburg.

  At the height of a raging pandemic, the defendant attempted to destroy over 500 doses of COVID-19 vaccine. What's worse, he concealed his misconduct, and fifty-seven people received doses of vaccine that the defendant had attempted to sabotage. For weeks, these victims did not know if they had been inoculated, poisoned, or given the functional equivalent of a placebo.

  The defendant has since pled guilty to two counts of attempted tampering with a consumer product, with sentencing set for June 8, 2021. The parties anticipate that the defendant will be subject to a Guideline sentencing range of 41-51 months' imprisonment.

  The government believes the Court should impose a sentence at the high end of that range.

Over the course of two days, this defendant attempted to waste over 500 doses of life-saving vaccine, during a once-in-a-century pandemic. He undermined public faith in both vaccines and our health care institutions. He betrayed his co-workers. He endangered his patients. And he covered up his crimes, until fifty-seven people had already paid the price for his choices.

This grave misconduct calls for a sentence at the high end of the Sentencing Guideline range—51 months' imprisonment.

I.  **Factual Background**

   A.  **Defendant's Background and Knowledge**

The defendant was a licensed pharmacist, with decades of experience. [20] at ¶ 12. Starting in 2012, he was the "third shift" pharmacist at the Aurora Medical Center in Grafton, Wisconsin (the "Grafton Facility"). *Id.* He was frequently the only pharmacist on duty, for hours at a time. *Id.*

As a pharmacist, the defendant knew and understood that: (1) public health authorities determined that COVID-19 poses a serious global health threat; and (2) the COVID-19 vaccine developed by Moderna, Inc. is intended to help mitigate that same threat. *Id.* at ¶ 13.

He appreciated that when vaccines are not stored in a manner consistent with the specifications articulated by public health authorities, their administration to patients poses a risk of bodily harm and death, insofar as the vaccines at issue may: (1) be rendered less potent or even inert, leading to patients believing they were vaccinated when they

2

were not; (2) break down into component parts which are themselves dangerous; or (3) become contaminated with foreign pollutants or pathogens. *Id.* at ¶ 14.

The defendant also specifically understood that Moderna's COVID-19 vaccine was not to be left out of refrigeration for more than twelve hours prior to its administration to patients. *Id.* at ¶ 15.

### B. Defendant's Concerning Past Behavior

Despite his training and experience as a medical professional, the defendant is a conspiracy theorist and vaccine skeptic. *Id.* at ¶ 16. He believed that the authorities were "out to get him"; that Judgment Day was imminent; that the 9/11 terrorist attacks were "fake"; that the Earth was flat; that he was a "prophet"; and that vaccines were "of the Devil." *Id.* The defendant had particular issues with the Moderna COVID-19 vaccine, believing that it was "microchipped" and would render recipients infertile. *Id.*

Over the past few years, the defendant frequently shared his extreme views with others. And he acted on these beliefs, in increasingly disturbing ways. *Id.* at ¶ 17.

On multiple occasions, the defendant was able to convince various co-workers to replace their annual flu vaccine with an inert saline solution. *Id.* at ¶ 18. In these instances, the defendant would utilize the pharmacy's technology to generate a label reflecting that a given syringe contained the annual flu vaccine; provide that label and a syringe containing saline to his accomplice; and then his accomplice would present the label and saline-syringe to an Aurora employee charged with administering the vaccine. *Id.* In this way, the defendant's accomplices would receive saline in lieu of the annual flu vaccine that was required as a condition of their employment with Aurora. *Id.* The defendant also

3

personally avoided receiving the annual flu vaccine using a similar plan. Each of these instances reflects a violation of federal law. *See generally* 21 U.S.C. §§ 331, 352.

Even more disturbing was the defendant's habit of bringing firearms to the Grafton Facility, in direct violation of Aurora's rules and regulations. *Id.* at ¶ 19. One witness described how the defendant, in approximately November 2020, showed that same witness a handgun and explained that it was for use in case the "military came to take him." *Id.*

Defendant's ex-wife ("GB") described similarly alarming behavior during their divorce proceedings. *Id.* at ¶ 20. More specifically, in a filing dated December 30, 2020, GB recounted how the defendant had rental units in which "bulk food and guns" were being stored. *Id.* GB also wrote that she was so "concerned about [her] safety and the safety of [their] children," as a result of the defendant's conduct and rhetoric, "that [she] left town for a period of time." *Id.* Defendant allegedly told her that "the government" was "planning cyber attacks" and intended "to shut down the power grid," which caused defendant to leave her "a water purifier, a large bucket of powdered milk and two 30-day emergency food buckets." *Id.* GB also relayed that after their youngest child had spent the weekend with the defendant, that same child told GB, "This is not our home, Heaven is our home." *Id.* GB stated to the divorce court that, based "on these statements, [she was] concerned that the children [were] in [risk of] imminent harm," as defendant might attempt to "take the children to heaven." *Id.* The defendant is currently subject to a "no contact" order with his children. *Id.*

4

### C. Defendant's Dangerous Crimes

Defendant's alarming rhetoric and actions culminated in a series of federal crimes in late December 2020.

On two successive shifts, on December 24 and December 25, 2020, the defendant removed the same box of COVID-19 vaccine from the refrigerator in the pharmacy at the Grafton Facility. *Id.* at ¶ 21. This box contained over 500 doses of vaccine, and the defendant left it out for multiple hours each night, intending to render it inert. *Id.*

The defendant's crimes were only discovered after a pharmacy technician working on the early morning hours of December 26 alerted her supervisors to the vaccine's presence outside the refrigerator. *Id.* at ¶ 22. When initially confronted, the defendant repeatedly lied and said the vaccine must have been left out on accident. *Id.* The defendant also did not initially acknowledge that the vaccine had been removed from the refrigerator on a prior occasion. *Id.*

After his arrest by state law enforcement, the government also recovered multiple firearms from the defendant.

### D. The Various Harms Defendant Caused

As the defendant well knew, the 500 vaccine doses that he attempted to tamper with were scheduled for imminent administration, largely to his fellow health-care workers. *Id.* at ¶ 23; *see also* [23] at *3. Fifty-seven of those same doses were in fact given to patients on the morning of December 26, 2020. [20] at ¶ 23.

And while it currently appears that the vaccine received by these fifty-seven people remained effective—despite the defendant's best efforts—the harms he caused were multifaceted and severe. *Id.* at

Most obviously, the fifty-seven people who received the vaccine have been forced to reckon with the aftermath of the defendant's betrayal. Their pain, frustration, and anger are both acute and eminently understandable:

- One victim, a medical professional, described feelings of "anxiety," "anger," and "lasting worry and stress," alongside an inability to focus on daily tasks or sleep, [9-1];

- Another victim—a medical doctor and executive at the Grafton Facility—experienced "fear", "anxiety," "dread," and "significant anguish," lasting for "many weeks," [23] at *15;

- A different victim described how the defendant "selfishly placed his own ideas and motivations above" the victim's and thereby "knowingly, disrespectfully" violated them, *id.* at *17;

- Another victim on the front lines of the pandemic expressed that there was not a "penalty . . . suitable for what" the defendant had done, given that the defendant had "betrayed" both his "co-workers" and his "profession," *id.* at *18; and,

- A different victim described how their initial feelings of "excitement and hope for the future" curdled into anger after learning of the defendant's crimes: "He had no right to make that decision for me. Despite how he felt regarding the

6

vaccine or COVID-19, this was my choice and my body . . . . He took away the security of knowing I was protected from this virus . . . . He had no right to do that . . . . He deserves no leniency," *id.* at *19.

Aurora itself similarly suffered "multiple levels of harm," in terms of professional reputation, employee welfare, newfound concerns regarding physical insecurity, and lost patient confidence in the care Aurora provides each day. *Id.* at *2-8; *see also* [9-2].

The defendant's offenses also contributed to an ongoing, macro-level threat to public health. By engaging in the crimes of conviction, the defendant lent the imprimatur of his title to various conspiracy theories and anti-vaccine views. His actions have been lauded on the internet by those who share his dangerous perspective. *See generally* [9-3] ("His conscience is clear" because "he did his job"; "Ahhh I wouldn't take that crap if they offered me all the gold on Earth," since "they own people know its poison"; "I def won't take these if they can be spoiled"; "I commend him . . . The lab coats and general public know").

Public health authorities have been working diligently, for months, to educate the public about the benefits of vaccination against COVID-19, and the defendant's crimes directly undermined those efforts. The human cost associated with those harms is difficult to quantify but very real.

## II. Argument

The parties agree that the defendant is subject to a Guideline sentencing range of 41-51 months' imprisonment. And while the Sentencing Guidelines are no longer mandatory, they remain the "lodestar" of federal sentencing, "inform[ing] and

7

instruct[ing] the district court's determination of an appropriate sentence." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016).

And here, a sentence of 51 months' imprisonment—the high end of the touchstone range—is appropriate, considering several of the factors articulated at Title 18, United States Code, Section 3553(a).

### A. Nature and Circumstances of the Offense

The Seventh Circuit teaches that the offenses of conviction are "innocuous-sounding" but "unquestionably dangerous[.]" *United States v. Smith*, 544 F.3d 781, 785 (7th Cir. 2008).

The facts here bear out this characterization.

The defendant intended to cause over 500 people—many of them healthcare workers—to incorrectly believe they were inoculated against a deadly pathogen. His actions would have imperiled not only those individuals, but also others with whom they would come into contact, including their family members and patients at the Grafton Facility. When initially confronted, the defendant denied any wrongdoing, compounding the risks posed by his misconduct. And his crimes of conviction are only the most recent example of the defendant pushing his extreme, dangerous views on others, coming on the heels of his attempts to convince his co-workers to substitute saline solution for their annual flu vaccine.

In short: the nature and circumstances of the offenses of conviction are quite aggravated, counseling in favor of a substantial sentence here.

8

## B. History and Characteristics of the Defendant

The instant offenses are particularly galling given the defendant's educational and professional history. He was a trained pharmacist, entrusted by his employer and his patients with the critical work of appropriately preparing life-saving medication. The defendant betrayed that trust and attempted to repeatedly deceive the patients who relied on him. He thereby imperiled public confidence in both COVID-19 vaccines and the medical community generally.

Because this defendant had the training, knowledge, and experience required to understand the gravity of his misconduct, his history and characteristics similarly suggest that the Court should impose a substantial sentence.

## C. Seriousness of the Crimes and Need to Provide Just Punishment

Defendant's crimes were deadly serious. By substituting his own fringe views for the considered, personal medical judgments of his victims, he robbed his victims of their autonomy, their agency, and their security. A just punishment here necessarily entails a term of imprisonment at the high end of the Guideline range, given the pain and suffering the defendant inflicted.

## D. Need to Protect the Public

A substantial sentence at the high end of the Guideline range is also needed to protect the public from the defendant, in that he has serious mental health problems and a demonstrated interest in firearms. Given this volatile mix, the people who knew the defendant best—his employer and his former spouse—have taken discrete steps to protect themselves from the defendant. Their actions speak volumes.

### III. Conclusion

This defendant put his patients in harm's way, in service of an ideology that is antithetical to his training, education, and experience as a pharmacist. He could have easily killed multiple people; instead, he caused untold anguish and anxiety for fifty-seven victims and undermined public confidence in the nation's primary weapon in the fight against COVID-19.

Crimes of this magnitude deserve substantial punishment. The government accordingly requests that the Court impose a sentence of 51 months' imprisonment.

Dated at Milwaukee, Wisconsin, this 4th day of June, 2021.

Respectfully submitted,

RICHARD G. FROHLING
Acting United States Attorney

By: *s/ Kevin Knight*
Kevin C. Knight
Assistant United States Attorney
United States Attorney's Office
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1727
kevin.knight@usdoj.gov

Ross S. Goldstein
Senior Litigation Counsel
United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, D.C. 20044
Telephone: (202) 353-4218
ross.goldstein@usdoj.gov

Rachel E. Baron  
Trial Attorney  
United States Department of Justice  
Consumer Protection Branch  
P.O. Box 386  
Washington, D.C. 20044  
Telephone: (202) 598-7719  
rachel.e.baron@usdoj.gov